### BREMER v. LUFF et al.

District Court, N. D. New York.
Oct. 21, 1933.

O. H. Droege, of New York City, for plaintiff.

Oliver D. Burden, U. S. Atty., and H. R. Follett, Asst. U. S. Atty., both of Syracuse, N. Y., and E. Barrett Prettyman, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C. (Frank F. Kirell, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C., of counsel), for defendants.

COOPER, District Judge.

This is an action to recover the sum of $1,707.54, with interest, alleged over payment of the federal estate tax assessed upon the estate of Louis Bremer, deceased. In the brief the claim is reduced to $1,490.57.

The controversy arises over the assessment made by the Department in the federal estate tax proceeding upon several parcels of real estate in New York City owned by Louis Bremer and his wife as tenants by entirety at the time of his death on March 6, 1929, and one parcel in Pelham Manor, N. Y.

The several parcels, the date acquired, the alleged purchase price, their assessed value in the federal estate tax proceedings, the alleged original mortgage indebtedness, and such indebtedness at the death of Louis Bremer, are as follows:

| Description. | Date Acquired. | Purchase Price. | Assessed Valuation. | Original Mortgages. | Cash Paid. | Mortgages at Death. Principal. | Interest. |
|---|---|---|---|---|---|---|---|
| 1329 2nd Ave. | 6/20/04 | $ 35,500 | $ 40,000 | $ 30,500 | $ 5,000 | None | |
| 1331 2nd Ave. | 1916 | 22,000 | 40,000 | None | 22,000 | None | |
| 1353 2nd Ave. | 12/10/19 | 20,000 | 45,000 | 12,000 | 8,000 | None | |
| 1351 2nd Ave. | 4/2/20 | 19,500 | 45,000 | 11,000 | 8,500 | 11,000 | $ 203 |
| 1453 3rd Ave. | 6/1/20 | 110,000 | 180,000 | 75,000 | 35,000 | 60,000 | 1,050 |
| Pelham Manor, | 9/24/24 | 47,000 | 48,000 | 27,000 | 20,000 | 20,000 | 420 |
| | | $254,000 | $398,000 | $148,500 | $105,500 | $91,000 | $1,673 |
| | | | | | | 1,673 | |
| | | | | | | $92,673 | |

The plaintiff contends that the original purchase price of 1331 Second avenue was $25,000 and not $22,000, but, since no claim of refund is made by plaintiff on this property for lack of proof, the purchase price becomes immaterial.

The defendant contends that there was no proof to support a purchase price of $35,500 for 1329 Second avenue and that the proof shows a purchase price of $25,000 only, and that no cash was paid. This is referred to later herein.

The widow, as executrix of the will of Louis Bremer, claimed that, because this real property was owned by him and her as tenants by entirety, the decedent's estate was liable for estate tax upon only one-half of the appraised value of these parcels of real estate,—made federal estate tax return upon that basis on November 25, 1929, and paid a tax of $8.35 thereon. $100,000 exemption was deducted in such return.

December 31, 1930, the Deputy Commissioner notified the executrix by letter that a deficiency tax had been tentatively determined. In the statement accompanying the letter it was stated that the assessment proposed for such deficiency tax was based upon the inclusion of the whole of the above-mentioned real estate in the gross estate at its full assessed value, $398,000.

March 24, 1931, the Commissioner notified the executrix by letter that the tentative findings set forth in the letter of the Deputy Commissioner dated December 31, 1930 (with adjustments not involved), had been accepted as final, and that an additional federal estate tax of $1,716.31 had been determined, upon the following basis:

|  | Returned. | Tentatively Determined. | Determined. |
|---|---|---|---|
| Gross Estate | $162,926.92 | $403,436.61 | $402,154.07 |
| Deductions | 158,749.65 | 204,886.40 | 204,886.40 |
| Net Estate | $ 4,177.27 | $198,550.21 | $197,267.67 |
| Gross Tax | 41.77 | 4,456.61 | 4,418.03 |
| Credit for State estate, Inheritance, Legacy and or succession taxes | 33.42 | 2,693.37 | 2,693.37 |
|  | $ 8.35 | $ 1,763.14 | $ 1,724.66 |
| Deficiency | | | $ 1,716.31 |

The deductions included the mortgage indebtedness of $92,673 before shown, the $100,000 exemption and some other things not material here.

The tax of $1,716.31 was paid under protest.

On January 29, 1932, the executrix filed claim for refund of $1,716.31, and interest from March 6, 1930.

On April 2, 1932, the Commissioner notified the executrix by letter that her claim for refund had been disallowed, and that the "entire value of the property involved in the protest is included as a part of the gross estate under the provisions of Section 302 (c) of the Revenue Act of 1926 and Treasury Decision 4295." Thereupon this action was brought.

The plaintiff executrix died and Emma Bremer, administratrix with the will annexed, was substituted as party plaintiff. The defendant also died and his executors have been substituted as parties defendant.

The statute and departmental regulations involved are:

"Sec. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated— * * *

" (e) To the extent of the interest therein held * * * as tenants by the entirety by the decedent and spouse * * * except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for * * * money or money's worth: Provided, That where such property or any part thereof, or part of the consideration with which such property was acquired, is shown to have been at any time acquired by such other person from the decedent for less than an adequate and full consideration in money or money's worth, there shall be excepted only such part of the value of such property as is proportionate to the consideration furnished by such other person. * * *" 26 USCA § 1094 (e).

"Art. 23. Taxable Portion—The entire value of such property is prima facie a part of the decedent's gross estate, but as it is not the intent of the statute that there should be so included a greater part or proportion thereof than is represented by an outlay of funds, which, in the first instance, were decedent's own, or more than a fractional part equal to that of the other joint owner where neither had parted with any consideration in its acquirement, facts, which in a given case bring it within any one of the exceptions enumerated in the statute, may be submitted by the executor.

"Whether the value of the entire property, or only a part, or none of it, enters into the

make-up of the gross estate depends upon the following considerations: (1) So much of the property (whether the whole, or a part thereof) as originally belonged to the other joint owner, and which at no time in the past had been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth, forms no part of the decedent's gross estate. * * *"

The several parcels of real estate except 1331 Second avenue were acquired in this manner. A part of the purchase price was paid in money and the balance by assuming existing mortgages or giving purchase-money mortgage or both. The whole purchase price of 1331 Second avenue was paid in money.

It is not disputed that, though 1329 Second avenue was purchased in 1904, such property comes within the provisions of section 302 by virtue of subdivision h, enacted in 1924 (26 USCA § 1094 note), making the federal estate tax applicable to the property purchased before as well as after 1916, the effective date of the Revenue Act in question. It could not well be disputed, since the decision of the Supreme Court in Gwinn v. Commissioner, 287 U. S. 224, 53 S. Ct. 157, 77 L. Ed. 270, followed in Robinson v. Commissioner (C. C. A.) 63 F.(2d) 652.

Nor does it seem to be disputed that the burden is upon the plaintiff to show that the wife contributed one-half of the purchase price of the property at the time of the conveyance of the property to the deceased and his wife as tenants by entirety.

Nor is it disputed that the question here must be determined by the amount of the contributions of the husband and wife "in the first instance" (article 23), that is, at the time of the original purchase.

Plaintiff asserts that, except as to 1331 Second avenue, plaintiff has shown that the wife contributed one-half of the consideration for the purchase of these properties in this way:

(a) By using funds deposited in the joint bank accounts of husband and wife which are claimed to have belonged to them in equal shares.

(b) By payment out of her individual bank account toward the purchase of 1329 Second avenue.

(c) By the joint assumption of existing mortgages or the joint giving of purchase-money mortgages.

As to the joint bank deposits (a), plaintiff says these were the rent of the properties

previously owned and the moneys borrowed on joint notes of both husband and wife.

Defendant contends (1) that there is no substantial proof that the joint bank account came from rents; (2) that the fact that the borrowed money came from joint notes is immaterial as the collateral for security was the husband's, the credit on which the loan was obtained was his, that payment of the notes must have been made by him; that she was a housewife with no property or credit of her own; (3) that in the joint making and indorsing of notes the wife was a mere accommodation maker or indorser without interest therein; (4) that the wife, while legally obligated on the assumed and given mortgages, was also in the nature of an accommodation obligor without interest therein; (5) that plaintiff has utterly failed to meet the burden of proof and must fail.

■ That income from real property held as tenants by entirety is the individual property of each tenant in equal shares is the law of the state of New York. Hiles v. Fisher, 144 N. Y. 312, 39 N. E. 337, 30 L. R. A. 305, 43 Am. St. Rep. 762; In re McKelway's Estate, 221 N. Y. 15, 116 N. E. 348, L. R. A. 1917E, 1143.

■ It does not seem that the rights of tenants by entirety in this respect is effected by the tax laws of the United States.

The proof that the joint bank accounts came to any extent from the rents is not strong and is discussed later.

The cash paid for the purchase of these properties as shown in the foregoing table is $105,500, or $100,500, if we consider the purchase price of 1329 Second avenue as $25,000 instead of $35,500. This change of purchase price would also reduce the original mortgage indebtedness to $143,500.

Taking $100,500 as the cash paid, and deducting $22,000 cash paid for 1331 Second avenue, leaves $78,500 cash paid for other properties.

Of this there was borrowed from the Yorkville Bank $50,000 and deposited in and checked from a joint checking account in that bank. Plaintiff claims in the brief that an additional item of $7,000, drawn from the savings account in the Yorkville Bank (book 28765, P. Ex. 20), April 1, 1920, was also borrowed from the Yorkville Bank, but the court finds no evidence that such sum was borrowed.

Deducting this $50,000 from the $78,500 leaves $28,500 paid out of the joint savings account and not borrowed. If we add the $22,000 purchase price of 1331 Second ave-

nue, we have $50,500 cash paid on the purchase price and not borrowed. We thus have $50,000 borrowed money and $50,500 not borrowed, making up this $100,500 cash paid upon the purchase price.

So far as the $50,000 borrowed money is concerned, $27,000 was borrowed on the note of Louis Bremer alone, indorsed by L. & L. Bremer. This primary obligation was not joint, but was the separate obligation of the husband. The notes for $27,000 were secured by government bonds and other bonds as collateral.

■ In the absence of any proof as to the manner of payment, it will be presumed that the maker of a note paid it and not the indorser.

■ That leaves $23,000 borrowed on two joint notes signed "L. & L. Bremer," September 24, 1924, and paid on the same day to the owner of the Pelham Manor property to complete the purchase price. Those notes matured January 25, 1925.

Was the wife equally interested as an obligor or maker of the notes with her husband? That is to say, did she have separate property or income, aside from the real estate previously purchased in the joint name, from which this $23,000 could be collected, or was she without substantial property or income and more in the nature of an accommodation maker of the note?

True the proceeds of the notes went to purchase the Pelham Manor house taken in the joint names as tenants by entirety and did not go to the other maker of the note as is usual in accommodation signatures to notes.

The record does not disclose that the wife had any separate estate or any separate business. The husband, however, had been in business, at least since the marriage and down to 1925 and 1926.

In his 1916 income tax return he makes a joint return for himself and his wife. The only income of the wife shown is $157.50 interest, while he shows income from:

| | |
|---|---|
| Salary as President of a Brewing Co......... | $ 600.00 |
| Income as W. L. D. and R. L. D.............. | 5,346.00 |
| Income from rents of three houses........... | 417.30 |
| Share in profits of partnership firm of Louis Bremer, located at 1453 Third Avenue and 1498 Second Avenue, N. Y.................... | 1,627.50 |
| Interest, Husband........................... | 70.00 |
| | $8,060.80 |

—and showing a net income of $7,691.66, including the wife's $157.50.

It appears in the evidence also that the wife had a small savings bank account in the Germania Savings Bank, to be later referred to, but there is no evidence that any of this was transferred to the joint account. The amount on deposit in this account on September 24, 1924, was $445.88. The only other account in the evidence is the joint savings bank account in the Yorkville Bank, above referred to. There is some evidence of a joint checking account in the Yorkville Bank, begun May 15, 1922, and closed May 20, 1929. There is no evidence of the deposits and withdrawals in this latter account. The evidence consists of the affidavit of the bank officer as to the loans obtained on notes and deposited in such account. Three checks on this account are in evidence, $3,000, $10,000, and $13,000, totaling $26,000, all in September, 1924, and all used for the purchase of the Pelham Manor property; $23,000 of this $26,000 was the proceeds of the two notes of September 24, 1924. There is some evidence that there was a joint checking account previous to 1922, but the account is not in evidence. That a man engaged in one or more different kinds of business would have had a bank checking account seems obvious. It may well be that he kept the account in the joint name of himself and wife with power to himself or either to sign checks. It may be presumed that he had a checking account either in his separate or in the joint names. But the evidence is silent as to any checking account, not a savings bank account, except the facts above mentioned, viz., that $50,000 was borrowed from the Yorkville Bank in 1922 and 1924, deposited in the joint checking account before mentioned and that three checks totaling $26,000 were drawn on such account in September, 1924.

If there were evidence of such checking account, it would probably show the payment of these notes out of such account. They were not paid out of the joint savings account in the Yorkville Bank.

In any event, in the absence of proof, it will be presumed that the notes were not paid by the wife.

The notes themselves are not in evidence. There is no proof that the wife actually signed any such notes. The three contemporaneous checks totaling $26,000 are in evidence (P. Ex. 28, 29, and 30).

They are signed merely "L. & L. Bremer." It is clear that one hand wrote such signature.

Two of them (29 and 30) are payable to "L. & L. Bremer" and endorsed "L. & L.

Bremer." The indorsement, like the signature to the note, is clearly written by one person.

If any one were to sue the wife on these notes, such person would have to prove that Lena Bremer signed the notes or authorized her husband to sign her name thereto, or that both authorized some third person to sign both their names.

Under the circumstances existing here, the husband, a substantial business man, and the wife with no business or substantial separate estate, it is so probable that the wife's name was not signed by her to the notes, but used in a general course of conduct with banks where two names are required on notes, and therefore in the nature of an accommodation maker, that it should be held that the plaintiff has failed to meet the burden of proof that the wife provided one-half, or any other part of this $23,000, money borrowed on the joint notes.

This leaves $50,500 cash paid on account of purchase price not borrowed on notes. This includes $10,500 claimed by plaintiff to have been paid on 1329 Second avenue beside the $25,000 mortgages given and assumed. It is claimed by plaintiff that $5,000 of this $10,500 was in the form of a mortgage on the premises which was not recorded and could not be produced or otherwise proved. The remaining $5,500 is claimed to have been provided in cash by the husband and wife subject to certain adjustments of interest, but no proof of such payments was produced except $1,290 withdrawn by the wife from her separate savings bank account in the Germania Savings Bank and later discussed.

Deducting the $10,500 from $50,500 cash paid but not borrowed leaves $40,000 claimed to have been paid out of rents received from the real property.

What is the proof that any such sum was received from rents, so that it could have been paid for the purchase of these properties?

The substituted plaintiff upon the trial testified that the rents were deposited in the joint checking account, and then, when the money had accumulated, transferred to the joint savings account. There can be no doubt that she was sincerely trying to give such information as she had upon the subject. She began to keep such accounts of the rents after 1914. She could produce no records kept by her, saying that most of them had been destroyed when the family moved to Pelham Manor in 1924. As stated, no bank accounts were produced except the joint account in the Yorkville Savings Bank, No. 28765.

This account is in the name of Louis Bremer and Lena Bremer and stamped across both names with a rubber stamp are the words: "To be drawn by either or the survivor."

This account begins July 25, 1913, before the substituted plaintiff began to keep account of rents and when the only properties owned by the decedent and wife were 1329 Second avenue purchased in 1904 and the house which the family first purchased (215 East Seventy-First street) in 1903 or 1904 and sold before the death of the decedent.

This account begins with a deposit made July 25, 1913, of $14,277.41, and stated to be a balance brought forward. From the figures 15057 given in this book above the first entry, it is probable that this balance was brought forward from a previous savings bank account evidenced by book No. 15057, since the account book, Exhibit No. 20, is 28765. The previous book is not in evidence nor any transcript thereof.

The deposits and withdrawals in this book are as follows:

| | Deposits. | With-drawals. | Balance. |
|---|---|---|---|
| Balance brought forward, July 25, 1913, | $14,277.41 | | $14,277.41 |
| Int. to Jan. 1, 1914, | 214.15 | | 14,491.56 |
| Jan. 6, 1914, | | $ 2,000.00 | 12,491.56 |
| April 7, 1915, | 2,508.43 | | 14,999.99 |
| Jan. 1, 1915, | 377.73 | | 15,377.52 |
| Dec. 1, 1915, | 500.00 | | 15,877.52 |
| Int. to July 1, 1915, | 211.84 | | 16,089.36 |
| Jan. 10, 1916, | 2,000.00 | | 18,089.36 |
| Int. to Jan. 1, 1916, | 233.83 | | 18,323.19 |
| April 26, 1916, | | 233.83 | 18,089.36 |
| July 1, 1916, | | 18,000.00 | 89.36 |
| Int. to July 1, 1916, | 271.33 | | 360.69 |
| Jan. 24, 1917, | 1,000.00 | | 1,360.69 |
| Int. to Jan. 1, 1917, | 5.40 | | 1,366.09 |
| Aug. 2, 1918, | 3,000.00 | | 4,366.09 |
| Int. to July 1, 1918, | 54.65 | | 4,420.74 |
| Oct. 2, 1918, | 4,045.15 | | 8,465.89 |
| Nov. 2, 1918, | 4,671.81 | | 13,137.70 |
| Dec. 2, 1918, | 2,794.97 | | 15,932.67 |
| Int. to Jan. 1, 1919, | 74.13 | | 16,006.80 |
| Int. to January 1, 1920, | 483.78 | | 16,490.58 |
| Jan. 21, 1920, | 284.80 | | 16,775.38 |
| April 1, 1920, | | 7,000.00 | 9,775.38 |
| Int. to July 1, 1920, | 146.62 | | 9,922.00 |
| Aug. 17, 1920, | | 9,000.00 | 922.00 |
| Jan. 11, 1921, | 500.00 | | 1,422.00 |
| Int. to Jan. 1, 1922, | 53.39 | | 1,475.39 |
| Int. to July 1, 1922, | 22.12 | | 1,497.51 |
| July 1, 1922, | | 1,000.00 | 497.51 |
| Int. to Jan. 1, 1924, | 25.25 | | 522.76 |
| Nov. 6, 1924, | | 500.00 | 22.76 |
| Int. to July 1, 1924, | 10.44 | | 33.20 |
| Jan. 3, 1927, | 1,000.00 | | 1,033.20 |
| Feb. 1, 1927, | 1,000.00 | | 2,033.20 |
| Int. to July 1, 1927, | 40.78 | | 2,073.98 |
| Transferred to new book. | | | |

The total deposits in this account exclusive of interest are $37,960.30, and $2,000 of this was deposited in 1927, nearly three years after the purchase of the Pelham Manor house September 24, 1924, from which no rent was received because occupied by the family.

The total interest credited is $1,847.71, of which $40.78 accrued after September, 1924.

The total withdrawals were $37,733.83, and all except $500 was withdrawn before July 2, 1922.

In the 1916 joint income tax return of Louis Bremer, he states that, after paying taxes, interest, and other expenses, including repairs and depreciation, the net income for 1916 from the rent of three properties, which are 215 East Seventy-First street, 1329 Second avenue, and 1331 Second avenue, was $417.30. He states that one property was purchased in 1908, but that was probably error and intended to be 1904. This included 1331 Second avenue, which was purchased about July 1st of that same year of 1916. The rent of the 1331 Second avenue property was more than one-third of the total rent. On that basis the net income for rent from 1904 to the acquisition of 1331 Second avenue was about $300 per year (two-thirds of $417.30).

For the twelve years from 1904 to 1916 this would amount to $3,600 from rents. But prior to 1913, the decedent spent about $12,-000 in improvements to the home, 215 East Seventy-First street, according to the protest of the widow to the increased estate tax. That would exhaust all the rents received down to 1916 and more.

The balance of $14,277.41 transferred to the new joint savings bank account No. 28765 on January 25, 1913, could not have come from the rents previously received.

The $22,000 cash paid for the property 1331 Second avenue could not have come from rents. It is probable that the $18,000 drawn from the account July 1, 1916, was part of the $22,000, but this is now not material, since that property is withdrawn from the case.

Starting with 1917 with net rent of $417.-30 per year and carrying this net rental down to the purchase of the next property, 1353 Second avenue, December 10, 1919, would give three years (1917–1919) at $417.30, equaling $1,251.90.

The cash part of the purchase price of 1353 Second avenue was $8,000. No money was drawn from this joint account, and the plaintiff makes no claim that the wife paid any part of the original purchase price.

The next property acquired was 1351 Second avenue on April 1, 1920, when a cash payment of $8,500 was made. $7,000 of this was drawn from this joint savings bank account in the Yorkville Bank. There is no proof where the remaining $1,500 came from. The $1,251.90 rent might have been used for this purpose together with the rent from January 1, 1920, to April 1, 1920, for the four premises then owned from December 12, 1919, which three months' rent could not have amounted to more than one-third (three months) of a net yearly rental of about $660 or $220 additional, making $1,471.90, since there were no withdrawals from this joint account for payment of mortgage debt or otherwise.

The deposits in this account during 1917, 1918, and 1919 down to April 1, 1920, were $16,511.93 in five separate deposits. Clearly no such rent could have been received. The only evidence that any part of this was rent is the testimony of the substituted plaintiff.

If it were to be taken that $1,471.90 income from rent was received down to April 1, 1920, the wife's share is one-half, or $736.-45. This would make her contribution to the cash part of the purchase price of this property in the proportion of $736 to $8,500, or about one-eleventh. But the evidence is too vague and uncorroborated to warrant a finding that any part of the moneys were used for the purchase of 1351 Second avenue. The original mortgage remained on this property at the death of the decedent.

The next property purchased was 1453 Third avenue on July 1, 1920, when $35,000 cash was paid, less adjustments of about $570. $33,000 was paid by the check of L. & L. Bremer on some joint account on the Yorkville Bank, not in evidence, but not on this savings bank account, for there was no withdrawal on July 1, 1920, and not until August 17, 1920, when $9,000 was withdrawn. This was not an interest day, and no reasonable connection with the $33,000 payment appears. Thus no rent was used to purchase 1453 Third avenue.

No deposits were made in this joint savings bank account from April 1, 1920, until after the purchase of the Pelham Manor house in September, 1924, except $500 on January 11, 1921.

Concededly nothing was drawn from this account to purchase the Pelham Manor house

in September, 1924, the only property purchased after 1453 Third avenue, for all the cash part of the Pelham Manor house was borrowed on notes as before shown.

It may be asserted that the rent for a portion of the properties for one year is not a fair measure of the rent received. But the plaintiff is the very person who had most to do with collecting the rents and made some record of them, which it may be inferred was destroyed in 1924. No evidence of any kind is offered as to the amount of the rents and the deductions therefrom.

There may have been some recollection of rents received.

If it were clear that plaintiff had some admissible evidence of the rents received and failed to produce it, the presumption might be invoked that such evidence, if produced, would have been unfavorable to plaintiff. But it is doubtful that the facts here would warrant that presumption.

If the court may take, as a measure of the rent, a sort of trade rule that the property must bring in rents of 10 per cent. upon its cost in order to bring a 6 per cent. return on the investment, we get this result as to the additional properties: $20,000, 1353 Second avenue, December 10, 1919; $19,500, 1351 Second avenue, April 2, 1920; $110,000, 1453 Second avenue, June 1, 1920—making a total of $149,500. Ten per cent. on $149,-500 is $14,950 annual gross rent, which may be taken as $15,000.

Under this rule, 4 per cent. is supposed to go for taxes, insurance, water rents, repairs, etc., leaving 6 per cent., or $9,000 remaining. From this 6 per cent. or $9,000 must be paid the interest on the mortgages. The mortgages on these three properties aggregated $97,000. Six per cent. of this would be $5,820. Deducting $5,820 from $9,000 leaves a net income of $3,180 on these three properties. Adding this to the $417 income obtained in 1916, and averaging the time from 1920 to 1924 when the premises in Pelham were purchased, would make in five years a total of $17,985. The mortgage indebtedness retired was $12,000 on 1353 Second avenue paid August 16, 1920, $9,000 of which was drawn August 17, 1920, from the joint savings bank account, leaving a balance of $922, and $15,-000 or more on 1453 Third avenue, making a total of more than $27,500.

It is clear, therefore, that both interest on the mortgages and consideration for the additional properties could not have come out of the rent. It is clear also that the $8,000 cash paid on the purchase price of 1353 Second avenue, December 10, 1919, could not have been paid out of the rent down to that time, for no such rent was received. Neither the $22,000 claimed to have been paid for 1331 Second avenue in 1916, nor the $8,500 additional paid on April 2, 1920, could have come out of the rents.

It must be held, therefore, that plaintiff has failed to show that the purchase price of any of these properties came out of the rents of any or all of these properties.

■ But, under the laws of the state of New York, moneys deposited in the name of husband and wife, in the absence of proof of other intent, are presumed to belong to the husband and wife in equal shares or as tenants in common. In re McKelway's Estate, 221 N. Y. 15, 116 N. E. 348, L. R. A. 1917E, 1143; Matter of Kaupper, 141 App. Div. 54, 57, 125 N. Y. S. 878; In re Blumenthal's Estate, 236 N. Y. 448, 141 N. E. 911, 30 A. L. R. 901.

■ This presumption will not prevail over the federal estate tax law, providing that, at the death of the husband, the entire joint deposit will be taxed as the property of the husband, unless the wife can show by proof aside from the presumption that she contributed one-half or some other part thereof. Burke-Waggoner Oil Ass'n v. Hopkins, 269 U. S. 110, 46 S. Ct. 48, 70 L. Ed. 183; Robinson v. Commissioner (C. C. A.) 63 F.(2d) 652; Burnet v. Harmel, 287 U. S. 103, 53 S. Ct. 74, 77 L. Ed. 199; Weiss v. Wiener, 279 U. S. 333, 49 S. Ct. 337, 73 L. Ed. 720; New Orleans & N. E. R. Co. v. Harris, 247 U. S. 367, 38 S. Ct. 535, 62 L. Ed. 1167. These cases relate to the status of property or money so deposited at the time it becomes subject to federal tax law.

■ This joint bank account never became subject to federal tax laws in this aspect, for it was closed before the death of the decedent. By reason of that fact will the state law presumption prevail and the joint bank account be deemed the property of husband and wife in equal shares, and when used for the purchase of property will it constitute an equal contribution toward the purchase of such property within the meaning of the federal tax law in question, when the property thus purchased subsequently becomes subject to such tax laws? The question is not free from doubt, and no authorities have been cited or can be found. The better view is that the federal tax law reaches back and strikes down such presumption of equal ownership

so far as it relates to the use of the moneys so deposited as joint and equal contributions to the purchase of real estate taken as tenants by entirety and coming under the tax laws upon the death of the husband. Under such view the state law presumption alone cannot prevail to meet the burden imposed by the federal estate tax law upon the wife to affirmatively show that she contributed one-half of the money so deposited in the joint name of husband and wife.

■ Plaintiff has failed to meet the burden of showing that the wife contributed any part of the cash purchase price except a payment from the savings bank account for the purchase of 1329 Second avenue later discussed.

■ Turning now to the mortgage debt given and assumed, it has been shown that the amount of such debt is $143,500. The mortgage indebtedness so jointly assumed or given must, because the separate estates of both husband and wife are liable, be deemed to be equal contributions to the purchase price by each, asserts the plaintiff.

That the mortgages were given or assumed "in the first instance," that is, at the time of the original purchase, is without doubt. That the mortgages given and assumed are separate as well as joint obligations is also without doubt. Newton v. Evers, 215 N. Y. 208, 109 N. E. 118; Doscher v. Obermeyer & Liebmann, 177 App. Div. 256, 163 N. Y. S. 997.

But upon the question of whether or not the joint giving and assuming mortgages was a joint and equal contribution to the original purchase price, no satisfactory authorities are cited in the briefs.

There is no mere presumption of joint ownership as in case of joint bank account.

The joint and several liability of both husband and wife for such mortgage indebtedness is positive, fixed, and irrevocable, except for fraud, under the state law. That each signed the bonds and mortgages is certified by the notary public. The joinder of both in the bonds and mortgages was necessary, since title was taken in the name of both. The consideration (the title) passed to both, and the obligation to pay the balance secured by mortgage was that of both. The facts are inconsistent with the view that the wife was a nominal or accommodation party.

■ The statute says the whole estate shall be taxed except such part thereof as "may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for * * * money or money's worth."

Article 23 of the regulations states the same thing in slightly different language, but the same meaning. It says: "So much of the property as originally belonged to the other joint owner and which at no time in the past had been received or acquired by the latter from the decedent for less than an adequate consideration in money or money's worth, forms no part of the decedent's gross estate."

Surely no part of this property held as tenants by entirety was received or acquired by the wife from the husband, for the property came to them as such tenants from a third person, and their interests therein have always remained the same.

What their interests were, in the first instance, or at the time of the original purchase, seems to be controlling, regardless of what, if anything, happened thereafter to the property or to the interests of the husband and wife.

This is made clear by the illustrations under article 23 (c) and (d) of the regulations, which read thus:

"(c) Where the decedent prior to the acquisition of the property by himself and the other joint owner, gave the latter a sum of money which later constituted such other joint owner's entire contribution to the purchase price of the property, the entire value of the property should be included.",

"(d) Where the other joint owner, prior to the acquirement of the property received from decedent ——— which became ——— part of the purchase price ——— the value of the property to be included is to be reduced proportionally to the consideration furnished by the other joint owner in the original transaction."

■ If it were clear that (c) and (d) were not correct constructions of the statute, they should be overruled, but where, as here, the meaning is doubtful in its application to a case like this, the departmental construction should be followed by the courts.

■ Since the mortgages given and assumed are part of the consideration given at the purchase of these properties, the plaintiff is right and is entitled to exemption to the extent of such mortgage indebtedness given and assumed, less the amount unpaid, which has already been deducted from the gross estate.

It is not overlooked that such construction permits evasion of the statute by hus-

band and wife taking title to real estate as tenants by entirety, giving a mortgage for the whole consideration and the husband paying the mortgage thereby exempting the property from the federal estate tax.

The original mortgage debt was $143,500, $91,000 and $1,673 interest has been deducted from the gross estate for principal and interest on the outstanding mortgages. The remainder of the principal is $52,500; $26,250, one-half thereof, would be the amount the plaintiff contributed to the purchase price of properties other than 1331 Second avenue, where no mortgage was given, and 1351 Second avenue, where the original $11,000 mortgage remains, and has been deducted.

The $45,000 mortgage on 1453 Third avenue is not assumed as are the other mortgages. The deed merely conveys the property subject to the $45,000 mortgage.

But this $45,000, together with $15,000 of the original $30,000 mortgage given by the decedent and wife on 1453 Third avenue, making $60,000, remained on the property at the death of the decedent and is part of the $91,000 mortgage debt deducted from the gross value of the estate.

The fact that 1453 Third avenue was purchased subject to the $45,000 mortgage which was not assumed does not therefore change the $52,500 of mortgage debt given or assumed and not outstanding at the death of the decedent.

The proportionate share of the purchase price and of the present assessed valuation in the tax proceedings represented by this $26,250 may be computed by counsel and embodied in the findings.

■ One thing remains for consideration, viz., the cash claimed to have been paid by the wife as part of the purchase price of 1329 Second avenue. Her individual savings bank account in the Germania Savings Bank is in evidence.

This property was purchased on June 20, 1904. The parties have all passed away, and no proof other than the wife's book of the cash consideration paid could be produced.

On July 1, 1903, she withdrew from her savings account $1,290, leaving only $126.29 therein.

Emma Bremer testified that in the purchases of these properties her father and mother sometimes gave a note running until the next interest day at the bank and procured money for the purchase price or part thereof. There is other evidence of such procedure in the purchase of other properties.

The proof is sufficient under the circumstances here existing to warrant a finding that this $1,290 was a part of the purchase price of 1329 Second avenue, and the court so finds.

■ Plaintiff claims the purchase price was $35,500, of which $25,000 consisted of mortgages given and assumed. The $10,500 remaining, plaintiff claims to have paid by a $5,000 mortgage and $5,500 in cash subject to some interest adjustments. No such $5,000 mortgage was recorded or could be proved.

Plaintiff's claim of $35,500 purchase price may be taken as an admission against interest. The $10,500, less $1,290, not having been shown to have been paid by the wife, must be held to have been paid by the husband. The plaintiff is entitled to a reduction from the assessed value of 1329 Second avenue in such proportion as this $1,290 payment toward the assumed purchase price of $35,500. This is, of course, independent of the mortgage deduction above referred to.

It is not necessary to consider any other questions.

All objections to evidence offered in which decision was reserved are overruled; the evidence received, and exceptions taken.

Findings may be prepared in accordance with this decision.

The collector, acting in good faith in an official capacity, under the direction of the Department, should be not liable for costs, nor should his estate.